J-S69012-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| CHRISTOPHER LEE GESSNER | |
| Appellant | No. 322 MDA 2016 |

Appeal from the Judgment of Sentence Entered October 14, 2015
In the Court of Common Pleas of Dauphin County
Criminal Division at Nos: CP-22-CR-0003249-2011 and
CP-22-CR-0005329-2014

BEFORE: STABILE, DUBOW, and PLATT,[*] JJ.

MEMORANDUM BY STABILE, J.:               **FILED FEBRUARY 23, 2017**

Appellant Christopher Lee Gessner appeals from the October 14, 2015 judgment of sentence entered in the Court of Common Pleas of Dauphin County ("trial court"), following his jury conviction for criminal attempt-homicide, aggravated assault, two counts of arson, cruelty to animals, recklessly endangering another person ("REAP") and criminal solicitation to commit murder.[1] Upon review, we affirm.

The facts and procedural history underlying this case are uncontested.[2]

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 901(a), 2702(a)(1), 3301(a)(1)(i), 5511(a)(2.1)(i)(A), 2705, and 902(a), respectively.

[2] Unless otherwise specified, these facts come from the trial court's January 9, 2017 opinion.

Appellant was accused of setting his trailer on fire with his girlfriend, (the "victim") and her dogs inside. He poured gasoline all over the trailer and splashed it on her. She had to run through fire to escape. The victim was severely burned and the dogs perished in the fire. The victim described the manner in which Appellant started the fire, detailing that she was trapped in the trailer without a means of escape other than running through fire. Appellant made admissions at the scene that he had started the fire with gasoline. Arson investigators were able to determine that the fire was started in a manner consisted with the victim's testimony. As a result, Appellant was charged with, among other things, criminal attempt-homicide, aggravated assault, two counts of arson, cruelty to animals, and REAP.

While in prison awaiting trial, Appellant solicited a former cellmate to kill the victim to make the charges go away. The informant indicated that Appellant approached him while they were incarcerated together to discuss killing the victim. He further noted that these conversations took place over a two-year period and that some of them were recorded. Appellant paid the informant $500, which he had received from his sister in connection with a civil suit. As police investigated the solicitation, they brought Appellant in for questioning. At the time of the interview, the police were aware that Appellant had been deemed competent to stand trial and that he had undergone psychological evaluations relating to the charges arising out of the arson incident. Eventually, Appellant was charged with criminal solicitation-murder.

Subsequently, Appellant filed a motion to suppress, claiming, *inter alia*, that he did not knowingly or intelligently waive his ***Miranda***[3] rights when he was interviewed by police in connection with the solicitation to commit murder charge. Following a hearing, the trial court denied Appellant's suppression motion on August 11, 2015. The charges were consolidated for trial. A jury trial was held, after which Appellant was found guilty of the above-referenced charges. On October 14, 2015, the trial court sentenced Appellant to an aggregate sentence of 28 to 56 years' imprisonment followed by two years' probation.[4] On October 23, 2015, Appellant filed a timely post-sentence motion, asserting only that the verdict was against the weight of the evidence. On January 29, 2016, the trial court denied Appellant's post-sentence motion. Appellant timely appealed to this Court.

On appeal, Appellant raises two issues for our review:

> I. Whether the trial court erred in failing to suppress Appellant's statements where Appellant's statements were

_____

[3] ***Miranda v. Arizona***, 384 U.S. 436 (1966) (holding that statements obtained from defendants during interrogation in police-dominated atmosphere, made without full warning of applicable constitutional rights, were inadmissible as having been obtained in violation of Fifth Amendment privilege against self-incrimination).

[4] Appellant was sentenced to 240 to 480 months' imprisonment for criminal attempt-homicide. He received a concurrent sentence of 5 to 10 years in prison for aggravated assault, and two counts of arson. Appellant was sentenced to 12 months' probation for cruelty to animals and REAP, respectively. Finally, he was sentenced to a consecutive term of 96 to 192 months' imprisonment for criminal solicitation to commit murder.

obtained in contravention of **Miranda** [] and where Appellant was unable to knowingly, voluntarily, and intelligently waive his **Miranda** rights?

II. Whether the trial court erred in denying Appellant's post-sentence motion where Appellant's sentence is excessive and unreasonable and constitutes too severe a punishment in light of the gravity of the offense, Appellant's rehabilitative needs, and what is needed to protect the public?

Appellant's Brief at 7.[5]

In reviewing appeals from an order denying suppression,[6] our standard of review is limited to determining

whether [the trial court's] factual findings are supported by the record and whether [its] legal conclusions drawn from those facts are correct. When reviewing the rulings of a [trial] court, the appellate court considers only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. When the record supports the findings of the [trial] court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

**Commonwealth v. Griffin**, 116 A.3d 1139, 1142 (Pa. Super. 2015).

Instantly, Appellant first argues that the trial court abused its discretion in failing to suppress inculpatory statements he provided to police

_____

[5] Based on our review of the record, we note that Appellant's second issue challenging the discretionary aspect of his sentence is waived because he failed to raise it at sentencing or in his post-sentence motion. **See Commonwealth v. Parker**, 847 A.2d 745 (Pa. Super. 2004) (holding challenge to discretionary aspect of sentence was waived because appellant did not object at sentencing hearing or file post-sentence motion).

[6] We note that consistent with **In the interest of L.J.**, 79 A.3d 1073 (Pa. 2013), our scope of review from a suppression ruling is limited to the evidentiary record that was created at the suppression hearing. **See id.** at 1085

during an interview in connection with solicitation to commit murder allegations. Particularly, Appellant argues that his mental illness prevented him from understanding the nature of the *Miranda* rights and knowingly and intelligently relinquishing the same. To that end, he claims that the police "exploited" his psychological state as they were aware of issues concerning his competency prior to the interview. Appellant's Brief at 19.

Generally, statements made during custodial interrogation are presumptively involuntary, unless the accused is first advised of his *Miranda* rights.[7] *Commonwealth v. DiStefano*, 782 A.2d 574, 579 (Pa. Super. 2001), *appeal denied*, 806 A.2d 858 (Pa. 2002). Under *Miranda*, police officers are required to apprise suspects prior to questioning that they have the right to remain silent, that any statement made may be used against them, and that they have the right to an attorney. *Miranda*, 384 U.S. at 444. "The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." *Id.* As our Supreme Court explained in *Commonwealth v. Mitchell*, 902 A.2d 430 (Pa. 2006), *cert. denied*, 549 U.S. 1169 (2007):

> The determination of whether a confession is voluntary is a conclusion of law and, as such, is subject to plenary review. Moreover, the totality of the circumstances must be considered in evaluating the voluntariness of a confession. The determination of whether a defendant has validly waived his *Miranda* rights depends upon a two-prong analysis: (1) whether the waiver was voluntary, in the sense that defendant's choice

---

[7] It is undisputed that a custodial interrogation occurred in the case *sub judice*.

- 5 -

> was not the end result of governmental pressure, and (2) whether the waiver was knowing and intelligent, in the sense that it was made with full comprehension of both the nature of the right being abandoned and the consequence of that choice.

*Mitchell*, 902 A.2d at 451 (citations omitted). "Only if the 'totality of the circumstances surrounding the interrogation' reveals **both** an uncoerced choice **and** the requisite level of comprehension may a court properly conclude that *Miranda* rights have been waived." *Commonwealth v. Cephas*, 522 A.2d 63, 65 (Pa. Super. 1987) (emphasis added), *appeal denied*, 531 A.2d 1118 (Pa. 1987), *cert denied*, 484 U.S. 981 (1987). To assess voluntariness, a court should look at the following factors: (1) the duration and means of the interrogation; (2) the physical and psychological state of the accused; (3) the conditions attendant to the detention; (4) the attitude of the interrogator; and (5) any and all other factors which could drain a person's ability to withstand suggestion and coercion. *See Commonwealth v. Nester*, 709 A.2d 879, 882 (Pa. 1998). The Commonwealth bears the burden of proof "by a preponderance of the evidence that the waiver is voluntary, knowing, and intelligent." *Id.* To establish that, "the Commonwealth must demonstrate that the proper warnings were given, and that the accused manifested an understanding of these warnings." *Commonwealth v. Eichinger*, 915 A.2d 1122, 1136 (Pa. 2007), *cert. denied*, 552 U.S. 894 (2007).

Instantly, on August 5, 2015, the trial court held a suppression hearing, at which psychological reports were introduced into evidence. N.T. Suppression, 8/5/15, at 5. These reports indicated that Appellant was

diagnosed with bipolar disorder, depressive episodes, alcohol dependency and personality disorder *Id.* at 5-6. The reports did not indicate that he suffered from a psychotic or cognitive disorder; nor did either report indicate that Appellant was incompetent to stand trial. *Id.* at 6-7.

Detective Dennis Woodring, Dauphin County District Attorney's Criminal Investigation Division ("CID"), testified on behalf of the Commonwealth. *Id.* at 11. He testified that he had been with the CID for a little over 13 years. *Id.* at 11-12. Detective Woodring testified that on October 1, 2014, he and Chief John Goshert, CID, met with Appellant in a conference room at approximately 11:15 a.m. *Id.* at 12-13. Detective Woodring testified that Appellant was brought to the office by the sheriff's department as he had been in custody on the other charges. *Id.* at 13-14. Explaining the reason for the meeting, Detective Woodring stated:

> Chief Goshert had come to me prior to this and said that he had been working a case involving [Appellant] where [Appellant] allegedly tried to solicit people to kill [the victim]. I was involved in the initial investigation back on July 5, 2011, when the fire and the criminal attempt homicide charges were brought against [Appellant], so Chief Goshert came and asked me if I would help him with this investigation as well.

*Id.* at 12-13. Detective Woodring further testified that, prior to the commencement of the meeting, after Appellant accepted an offer for a soda and received Coca Cola, he was advised of his *Miranda* rights. *Id.* at 14. Specifically, Detective Woodring testified that before they started to interview Appellant, Appellant was advised that:

> he had the right to remain silent; that anything he said could and would be used against him; that he had a right to an

attorney, and if he couldn't afford an attorney, one would be appointed to him at no cost through the County of Dauphin; and if he did decide to talk to us that he could stop at any time to consult with an attorney.

*Id.* at 15. Detective Woodring testified that Appellant never requested an attorney, even after being advised "why he was there and what we had."

*Id.* In particular, Detective Woodring recalled:

Chief Goshert went over the letters that [Appellant] had written to the informants about the money that was paid, the $500 that was paid, to have [the victim] killed. And he also advised [Appellant] of the pictures that was staged of [the victim] looking like she was deceased that was shown to [Appellant] by the informant.

*Id.* at 15-16. Detective Woodring testified that, upon being confronted by the evidence and advised of his constitutional rights, "[Appellant] admitted to seeing the picture that had been brought in by one of the informants. And he admitted that $500 was paid, but not to have her killed. It was paid for civil—for civil suit that was supposedly taking place." *Id.* at 16. At some point during the interview, according to Detective Woodring, Chief Goshert exited the conference room.

Q. And once Chief Goshert left the room, what was the nature of the discussion then between you and [Appellant]?

A. Basically, he was told that, you know, hey, we had all this evidence against him. You know, whether or not he admitted to the charges, you know, he was still gonna be charged with it; that the evidence was—was overwhelming. And you know, we were talking about the letters and, again, the photograph and the $500 that was paid. And at one point [Appellant] asked me if I thought he needed an attorney. And I said, "I can't make that decision. That's up to you." And shortly after that, [Appellant] asked me if the phone was on, the phone that we have in the conference room. And I said that it was. And I said, "Do you want to call? Do you want to make a call?" And he said, "No,--"

Q. And when you said, "make a call," did you offer in terms of making a call to an attorney?

A. Yes.

Q. Okay.

A. Yes. And he said, "No. I just wanted to make sure that it wasn't recording." He was afraid that this phone was recording our conversation. And I believe at that point I picked the phone up and handed it to him just to hear the dial tone, and then I put it back down.

And, you know, we continued talking for a little bit. And then at some point he—he said—I said to him, I said, "I think, you know, it would probably be better if you took both these cases into court together to get them all done at one time," so he didn't have one hanging—hanging in the background. And he said something to the effect, "Well, that'll never happen; that [ADA] hates me. And I said, "Well, I don't know that to be the case."

*Id.* at 17-18. Detective Woodring testified that eventually, after Chief Goshert telephoned the ADA, it was relayed to Appellant that "no promises could be made" about consolidating the cases. *Id.* at 20. Thereafter, Appellant remarked "'What do you guys want to know? I'll tell you what you want to know.'" *Id.* Before proceeding with the interview, according to Detective Woodring, Appellant was provided with a written waiver of rights form, which he reviewed and executed. *Id.* at 21-22. Detective Woodring testified that the form was read to him prior to Appellant's signing it. *Id.* at 22.

Upon signing the written waiver of rights form, Appellant stated that his sister, who had provided him the $500, "was under the impression it was for a civil matter, was being paid for a civil matter." *Id.* at 21. Detective Woodring testified:

[Appellant] admitted to sending the letters to informants and having those discussions with the informants about having [the victim] killed. He admitted that that's what the $500 was paid for; it wasn't for a civil matter. And he also advised about seeing the picture again, that he—he saw the photograph. And

> he basically said the reason he had it done was that he had met [the victim] through a dating service, and she had ruined his life.

*Id.* Detective Woodring acknowledged that Appellant appeared to be connecting to the conversation, was responsive in his answers to questions, and did not "appear to be under the influence of any type of alcohol, drugs, or anything of that nature." *Id.* at 24-25. Detective Woodring testified that, being a law enforcement officer for thirty-eight years, he did not get the impression that Appellant was suffering from some type of mental health episode or that he was "having difficulty comprehending the discussion." *Id.* at 25. Detective Woodring further testified that Appellant refused to provide a tape-recorded or handwritten statement. *Id.* at 26. Detective Woodring remarked that he was aware of competency proceedings involving Appellant and that Appellant had been deemed competent to stand trial. *Id.*at 42.

On cross-examination, Detective Woodring remarked that Appellant had received two *Miranda* warnings: an oral one prior to the start of the interview and a written one prior to his confession. *Id.* at 30-31. Detective Woodring clarified that it was he who suggested to Appellant that the cases could be consolidated. *Id.* at 33. Detective Woodring also emphasized that he had not reviewed any psychological reports on Appellant prior to or at the time of the interview. *Id.* at 34. He, however, acknowledged that he was aware that Appellant had undergone a psychological evaluation. *Id.* at 43. Detective Woodring also acknowledged that Appellant appeared to be concerned at the interview that charges could be brought against his sister. *Id.* at 35.

Based on the foregoing, and considering the totality of the circumstances here, we conclude that the trial court did not err in denying Appellant's motion to suppress inculpatory statements made on October 1, 2014. There are no indications that Appellant did not understand fully the *Miranda* rights to render his waiver of them constitutionally infirm.[8] The record indicates that, although Appellant suffered from diagnosed mental problems, they did not affect his cognitive abilities. ***See Commonwealth v. Logan***, 549 A.2d 531, 537 (Pa. 1988) (stating that defendants with psychological problems are indeed able to make a valid waiver of their *Miranda* rights); ***accord Commonwealth v. Bracey***, 461 A.2d 775, 790 n.7 (Pa. 1983) (finding that a defendant who was prone to hallucinations could make a valid waiver of her constitutional rights). In fact, here Appellant was given the ***Miranda*** warnings twice. He received them at the start of the interview after being advised of the accusations against him. Appellant, however, waived his right against self-incrimination. He denied

---

[8] Appellant does not challenge the voluntariness of his ***Miranda*** waiver. Even if he had, the challenge would have failed. Here, the record would belie any suggestion that Appellant was coerced into relinquishing his ***Miranda*** rights. For instance, the investigating officers provided Appellant soda at the start of the interview and invited him to telephone an attorney during the interview. According to the suppression transcript, the interview lasted from 11:15 a.m. until 12:30 p.m. ***See*** N.T. Suppression, 8/5/15, at 13, 36. Moreover, even though it was suggested to Appellant that it might be beneficial for him to consolidate the cases, prior to Appellant's giving of the inculpatory statements, the investigating officers informed him that no guarantees could be made about consolidation.

the accusations, claiming that the $500 was paid in connection with a civil suit. Appellant again was given the **Miranda** warning after he indicated to Detective Woodring and Chief Goshert that he was ready to confess. The second time around, Appellant received a waiver form, which was read to him prior to him affixing his signature thereto. Further, the record indicates that Appellant connected to the conversation, was responsive in his answers and did not labor under the influence of alcohol or drugs.

The trial court reasoned:

> [W]hile Detective Woodring and Chief Goshert did inquire about consolidating the cases, and indicated to Appellant that they felt it would be in his best interest; the district attorney made no guarantee of such outcome. Nothing in the facts elicited at the suppression hearing suggests a coercive or manipulative interrogation. [Detective] Woodring was aware of at least one psychological evaluation that did not broach any concerns over capacity; the diagnoses were not of a sort that would impair cognitive abilities.

> Appellant was incarcerated on prior charges which would have exposed him to **Miranda** rights and what they entailed. He was **Mirandized** prior to any conversation regarding the solicitation investigation and again given a written **Miranda** rights waiver, which he signed, prior to the giving an official statement to police.

Trial Court Opinion, 1/9/17, at 6. Accordingly, Appellant is not entitled to relief.

Appellant cites only a single case, *i.e.*, **Cephas**, **supra**, to support his contention that he did not knowingly and intelligently relinquish his right against self-incrimination guaranteed by the Fifth Amendment to the United States Constitution. We, however, find **Cephas** distinguishable, given the

facts of this case as recited above. The following facts guided the decision

*Cephas*:

> [The defendant] was arrested on October 7, 1983 and charged with rape, indecent assault, indecent exposure, unlawful restraint, terroristic threats, and simple assault.
>
> . . . .
>
> [The defendant] was arrested on the basis of the victim's description. He was taken to the Sex Crimes Unit of the Philadelphia Police. At the time of his arrest, [the defendant] was a street person living in an alley near his foster family's home. He had a long history of mental illness and hospitalization for this illness. He had consistently been diagnosed as a schizophrenic. His most recent hospitalization was about two weeks before his arrest after he was seen in a tree near an elementary school screaming at the school children and yelling for the principal to meet his demands.
>
> [The defendant] was known to the police to be suffering from mental illness. When the arresting officers came to observe the alley where [the defendant] lived, his foster sister begged the officer to find help for [him] and to have him put away somewhere for his mental illness.
>
> Upon his arrival at the Sex Crimes Unit, [the defendant] was interviewed for background information. He was placed in handcuffs in a small detention room. He exhibited bizarre and psychotic behavior. The entire time he was in the detention room, he kicked the walls and the door, and he kept yelling inane comments, including that he was Ed Rendell's son and that he had dinner with Mr. Rendell the night before at Mr. Rendell's home. Mr. Rendell is the former District Attorney of Philadelphia and he is white. [The defendant] is black.
>
> [The defendant] was initially interrogated in an office by a detective who knew that [he] suffered from mental illness. During this interrogation, [the defendant] acted childishly. He refused to sit unless given a cigarette or soda and cookies. The detective ceased the interrogation and returned [the defendant] to the detention room where [he] continued his bizarre behavior.
>
> [The defendant] was interrogated again and he continued to display his childlike behavior. He was read the warnings mandated by [*Miranda*], and he made incriminating statements.

*Cephas*, 522 A.2d at 64. The defendant sought to suppress the inculpatory

statements. Following a hearing, the trial court agreed, granting the

defendant's suppression motion. The Commonwealth appealed to this Court. On appeal, we affirmed. In so doing, we concluded that the defendant suffered from chronic undifferentiated schizophrenia and that his mental illness prevented him from understanding the **Miranda** warnings. **Id.** at 65. We also agreed with the trial court's conclusion that, based on the evidence, the defendant was incapable of making a knowing and intelligent waiver of his privilege against self-incrimination. **Id.**

Unlike the court in **Cephas**, the uncontradicted facts of this case, as found by the trial court, indicate that Appellant's ability to knowingly and voluntarily waive his right against self-incrimination was not compromised by his mental condition. Indeed, the trial court specifically determined that Appellant's psychological or cognitive capacities were not affected by his mental condition. **See** Trial Court Opinion, 1/9/17, at 5 (noting that Appellant "appeared coherent" during the interview, "seemed to be connecting the dots," and was "responsive. . . . [Appellant] did not appear to be suffering from any sort of mental health episode that would hamper him from comprehending the discussion.").

In sum, we conclude that the trial court did not err in denying Appellant's suppression motion.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/23/2017